**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **MARIA MERCEDES LEGER** | § | |
| **DE LA CRUZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:15-CV-01949-K-BH** |
| | § | |
| **CAROLYN W. COLVIN, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order 3-251*, this case has been referred for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Brief on Review of the Social Security Administration's Denial of Benefits,* filed October 5, 2015 (doc. 11), and *Defendant's Response Brief in Support of the Commissioners Decision*, filed November 4, 2015 (doc. 12). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.  BACKGROUND[1]

### A.  <u>Procedural History</u>

Maria Mercedes Leger De La Cruz (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act). On April 2, 2012, Plaintiff filed her application for disability benefits under Title II of the Act, alleging disability beginning on March 1, 2006, due

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

to osteoporosis, hip pain, a bulging disc injury, orthopedic disorders, pulmonary disorders, lumbar spine impairment, and back pain. (R. at 27, 29, 46, 146, 162.)  Her application was initially denied on September 20, 2012, and upon reconsideration on November 2, 2012. (R. at 66, 67, 70-79.)  She timely requested a hearing before an Administrative Law Judge (ALJ) on December 11, 2012, and she personally appeared and testified at the hearing on November 4, 2013.  (R. at 27, 43-65, 80.)  On January 21, 2014, the ALJ issued his decision finding Plaintiff not disabled. (R. at 27-38.)  Plaintiff requested review of the ALJ's decision, and the Appeals Council denied her request on April 7, 2015.  (R. at 1-8, 20.)  She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on October 10, 1957, and was 57 years old at the time of the hearing before the ALJ.  (R. at 66.)  She has a high school education from the Dominican Republic and was unable to communicate in English.  (R. at 34.)  Her past relevant work experience includes employment as a parts inspector and a hand packager. (R. at 63.)

### 2.    Medical Evidence

On July 5, 2008, Plaintiff was admitted to the emergency room at University Medical Center of Southern Nevada (University Medical Center) after being involved in a motor vehicle accident and losing consciousness.  (R. at 238.)  She reported "[l]eft-sided chest pain," pain in the left upper abdomen, pain in the left shoulder, and shortness of breath. (R. at 238, 245.)  Diagnostic studies revealed a Grade III splenic laceration, multiple left-side rib fractures, small pneumothorax on the left (collapsed lung), left lower pulmonary contusion, and a small amount of left pleural effusion.

2

(*Id.*)  Plaintiff was breathing normally, her lungs were clear, her circulation was intact in all four extremities, her back and spine were stable and non-tender, her abdomen and neck were tender to palpation, her extremities had full range of motion, and she was neurologically intact despite being noticeably distressed due to pain.  (R. at 239, 241.)  Her EKG was normal, and her X-rays were negative.  (*See* R. at 246-60.)

On July 8, 2008, Plaintiff had a splenic artery angiogram with possible embolization and was transferred to the ICU for continued management.  (R. at 245.)  She was seen there for her chest pain by a cardiologist, who determined she had a stable rhythm and no pericardial effusion.  (*Id.*)  A CT scan of the chest on July 9, 2008, revealed a left pleural effusion.  (R. at 245.)  She had a chest tube placed in her left thorax, and continued to improve.  (*Id.*)

On July 14, 2008, Plaintiff was discharged from University Medical Center with instructions to maintain a regular diet, engage in activity as tolerated, and follow up, and with a prescription for Percocet and Colace (stool softener). (R. at 245.)  The discharging doctors, Robert Floyd, M.D. and Timothy Browder, M.D., reported that Plaintiff was "ambulating around the hallway with ease." (R. at 245.)

On August 20, 2009, Plaintiff went to Kennestone Hospital complaining of left back and flank (kidney) pain that had started three days earlier.  (R. at 331.)  She denied muscular weakness and had normal gait and ambulation.  (R. at 332-32.)  Examination revealed no tenderness and full range of motion in her extremities, but left costoverbal angle tenderness was present.  (R. at 333.) According to treatment notes, her back pain was "most likely caused by a strain of the muscles or ligaments that support the spine."  (R. at 337.)  A CT scan of her hip, back, abdomen, and pelvis revealed no fractures or dislocations in the hip, no acute inflammation within the abdomen or pelvis,

and no evidence of renal or ureteral calculus (kidney stones) on either side.  (R. at 341, 343, 346-47.)
Plaintiff was diagnosed with back pain and discharged that same day with a Vicodin prescription
and instructions to remain active, refrain from sitting or standing in one place for longer than 30
minutes, rest, take short walks, and place ice on her back as necessary.  (R. at 337.)

On February 15, 2011, Plaintiff visited Mildred Santorufo, D.O., complaining of headaches,
arthralgias, abdominal discomfort, breast tenderness, and allergies.  (R. at 289.)  She reported that
her headaches began two years earlier, and she rated the severity of her headaches and the
arthralgias as a 9 out of a 10.  (R. at 290.)  Her pain worsened while sitting, standing, and squatting,
and was associated with decreased mobility, numbness, spasms, tingling in legs, tenderness, and
weakness. (*Id.*) Dr. Santorufo noted that Plaintiff appeared uncomfortable.  (R. at 292.)  Plaintiff's
sensation, strength, balance, gait, coordination, fine motor skills, reflexes, and memory were all
intact.  (R. at 289-95.)  Dr. Santorufo ordered a CT scan of Plaintiff's head and made findings of a
cervical spine muscle spasms and severe pain with motion as well as tenderness in the lumbar spine,
hips, pelvis, and knees.  (R. at 293.)  Dr. Santorufo prescribed Plaintiff Flexeril, Atrovent, and
Fexofenadine. (R. at 294.)

On March 14, 2011, Plaintiff had a CT scan of the head. (R. at 284.) No brain abnormalities
were present. (*Id.*)

On April 12, 2011, Plaintiff returned to Dr. Santorufo, complaining of chest pain,
cough/congestion, insomnia, cervical pain, headaches, back pain, and arthralgias. (R. at 276-277.)
Dr. Santorufo diagnosed Plaintiff with osteoarthritis, mixed hyperlipidemia, and allergic rhinitis. (R.
at 276, 278.) She noted cervical spine tenderness with mildly reduced range of motion and left knee
tenderness with severely reduced range of motion. (R. at 278.) Plaintiff's balance, gait, and

coordination were intact, there was no motor weakness present, and her sensation was normal. (R. at 278.) A bone density test revealed a low range of osteopenia, but it was not to the level of osteoporosis. (R. at 279, 272-73.) Meloxicam was substituted for Flexeril and added to Plaintiff's other medications. (R. at 278.)

On March 5, 2012, Plaintiff visited Dr. Santorufo for uncontrolled back pain that was worsening, along with radiating pain to the left hip and bilateral hand arthalgias/swelling due to lifting. (R. at 268.) Dr. Santorufo noted Plaintiff's osteoarthritis was uncontrolled and that osteopenia was present in the lumbar spine with temporary improvements on medication. (*Id.*) Neuropathy was present in the lumbar spine. (*Id.*) Physical examination revealed stocking hypesthesia, tenderness and severe pain with motion in the lumbar spine, osteoarthritic changes in the hands with moderate pain on motion, and left hip pain and tenderness with range of motion. (R. at 270.) Dr. Santorufo diagnosed Plaintiff with osteoarthritis, mixed hyperlipidemia, and allergic rhinitis. (R. at 268.)

On June 11, 2012, Plaintiff followed up with Dr. Santorufo. (R. at 262-65.) Dr. Santorufo noted the osteoarthritis was unstable because Plaintiff was not taking her medication due to stomach irritation, she prescribed Zantac to help with the stomach irritation. (R. at 262.) Dr. Santorufo noted tenderness in the lumbar spine and both knees. (R. at 264.)

On September 14, 2012, State Agency Medical Consultant (SAMC) Frederick Cremona, M.D., reviewed the evidence and concluded that Plaintiff was able to occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, walk and/or stand 6 hours in an 8-hour work day, sit 6 hours in an 8-hour work day, and push and/or pull with no limitations except those for lifting and/or carrying. (R. at 297.) He further stated that Plaintiff could occasionally climb ramps and stairs,

balance, stoop, kneel, crouch, and crawl, but should never climb ladders, ropes, or scaffolds.  (R. at 298).  He did not find any manipulative, visual, communicative, or environmental limitations.  (R. at 299-300.)  Dr. Cremona also noted discrepancies in the medical record and concluded that "[l]imitations not fully supported by EOR."  (R. at 303.)

On October 15, 2012, four months after the relevant time period,[2] Dr. Santorufo completed a Multiple Impairment Questionnaire at the request of Plaintiff's attorney.  (R. at 304-11.)  Dr. Santorufo found that Plaintiff suffered from lumbar degenerative disk disease with myelopathy, and generalized osteoarthritis, worse in the left hip and hands.  (R. at 304.)  Her prognosis was poor.  (*Id.*)  Clinical findings included swelling of the proximal interphalangeal (PIP) and distal interphalangeal (DIP) joints in both hands, point tenderness with decreased range of motion in lumbosacral spine and left hip, and hypesthesia and decreased proprioception in left lower extremity.  (R. at 304.)  Plaintiff could not afford any laboratory or diagnostic tests results to support these diagnoses.  (R. at 305.)

Plaintiff's primary symptoms were pain in both hands, lumbosacral spine and left hip, decreased range of motion in some areas, and numbness/tingling in the left lower extremity.  (*Id.*)  She had joint swelling and tenderness, neuropathic pain, and muscle spasms in the DIP and PIP joints of both hands, lumbosacral spine, and left hip.  (*Id.*)  She was in constant pain with exacerbation due to movement and position.  (*Id.*)  The precipitating factors leading to pain were extended periods in any one position, repetitive hand movement (typing/writing), lifting, and bending. (R. at 306.) Plaintiff's pain and fatigue was rated as severe, 9 on a 10-point scale.  (*Id.*)  Dr. Santorufo had been unable to completely relieve the pain with medication without unacceptable

---

[2] Plaintiff's insured status expired in June 2012.

side effects, such as nausea/dizziness.  (R. at 306, 308.)

Dr. Santorufo opined Plaintiff was able to sit and to stand/walk, each for one hour total in an eight-hour day.  (*Id.*)  It was necessary or medically recommended that Plaintiff refrain from sitting and standing/walking continuously in a work setting.  (*Id.*)  Plaintiff also needed to stand up and move around every thirty to sixty minutes for  thirty to sixty minutes before sitting again.  (*Id.*)  Dr. Santorufo indicated that Plaintiff was disabled and could never lift or carry even 5 pounds.  (R. at 307.)  Plaintiff was essentially precluded from using her arms/hands for reaching, grasping, turning, and twist objects, and performing fine manipulations.  (R. at 307-08.) Dr. Santorufo opined that Plaintiff's condition interfered with her ability to keep her neck in a constant position and she could not do a full time competitive job that requires that activity on a sustained basis.  (R. at 308-09.)  Plaintiff's pain, fatigue or other symptoms would constantly interfere with her attention and concentration.  (R. at 309.)

Emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations.  (*Id.*)  Her pain increased with sadness, anger, fatigue, and frustration.  (*Id.*)  Dr. Santorufo opined that Plaintiff was not a malingerer.  (*Id.*)  Dr. Santorufo also opined Plaintiff was capable of performing low stress work.  (R. at 310.)   Plaintiff would sometimes need to take unscheduled rests every thirty to sixty minutes in an eight-hour working day, and she would have to rest for thirty to sixty minutes before returning to work.  (R. at 310.)  Plaintiff would likely miss work more than three times per month due to her impairment; had psychological limitations; was to avoid temperature extremes and repetitive motions; and could not push, pull, kneel, bend, or stoop. (*Id.*) Dr. Santorufo stated that the symptoms and limitations detailed in the questionnaire had applied since at least February 2011, when Plaintiff first came under her care.  (R. at 310.)

On the same day in a letter, Dr. Santorufo wrote that she had treated Plaintiff since February 2011 for polyarthralgias. (R. at 312.) Plaintiff was referred to orthopedics and advised to have an MRI, but she could not afford it. (*Id.*) Dr. Santorufo also stated that Plaintiff was not seen regularly for over a period of time due to her inability to work and loss of health insurance. (R. at 312.) Dr. Santorufo opined that Plaintiff's condition had declined because of this. (*Id.*)

On October 30, 2012, Randal Reid, M.D., another SAMC, reviewed the record and affirmed Dr. Cremona's assessment. (R. at 313.)

On October 4, 2012, Heriberto Salinas, M.D., began treating Plaintiff. (R. at 314-18.) Plaintiff reported midline lower and upper back pain described as "constant, pinching, sharp and discomfort." (R. at 314.) She asserted that her back pain began two years prior. (*Id.*) She also reported insomnia, muscle spasms, back pain, myalgias, and neck pain, but denied arthralgias and bone pain. (R. at 314.) Plaintiff also complained of hot flashes and obesity but denied hyperlipidemia, hypercholesterolemia, and Type II diabetes. (R. at 314.) Dr. Salinas noted a tender cervical and lumbar spine, but her coordination and gait were normal and her deep tendon reflexes intact. (R. at 316.) Dr. Salinas diagnosed Plaintiff with mylgia, myositis, and insomnia; he instructed her to exercise daily for thirty to forty-five minutes, twice daily, with stretching for fifteen minutes, short naps, and Epson salt baths; and prescribed Temazepam for insomnia. (R. at 316-17.)

On November 6, 2012, Plaintiff was seen for bone pain in the right arm, right foot, and right leg, and for dull and stable pain in the shoulder that began 2 days prior. (R. at 324.) She described the pain as "acute and dull." (*Id.*) Plaintiff also complained of fatigue, insomnia, and dizziness, but denied fever, chills, and weight loss. (*Id.*) She was obese, but all other vitals were normal and/or intact, including her gait and coordination. (R. at 325-26.) Dr. Salinas diagnosed Plaintiff with

obesity, insomnia, dizziness, myalgia, and mytosis, and prescribed Celebrex, Cymbalta, and Temazepam. (R. at 326.) Dr. Salinas also reported abnormal clinical findings and ordered a Hemoglobin A1c test. (R. at 326-27.)

On November 14, 2012, Plaintiff complained of depression, obesity, and hypercholesterolemia but denied anxiety, hypothyroidism, and type II diabetes. (R. at 319.) Aside from being obese, Plaintiff's vitals were normal and/or intact, including her gait and coordination. (R. at 320-21.) Dr. Salinas diagnosed Plaintiff with mixed hyperlipidemia, obesity, dizziness, insomnia, myalgia, and myositis, and instructed her to diet. (R. at 322-23.)

On February 8, 2013, Plaintiff presented with left lower back pain, described as "sharp pain, burning sensation and stable," that began one week prior. (R. at 371.) She denied swelling, arthralgias, and myalgias. (*Id.*) Her gait and coordination were normal. (R. at 373.) Dr. Salinas diagnosed Plaintiff with back pain, myalgia, and myositis, and he advised her to avoid activity that worsened symptoms, engage in gentle stretching, and apply ice/heat area as needed. (R. at 374.) The doctor also noted a back pain onset date of February 8, 2013, and a myalgia onset date of October 4, 2012. (R. at 375.)

On September 5, 2013, Plaintiff was seen for lumbar-sacral spine pain described as "aching, acute, chronic, constant, worsening, and discomfort." (R. at 351.) She reported that symptoms started "OVER 10 years ago." (R. at 351.) Her pain moderately limited her activities and was triggered by bending, lifting, twisting, and activity. (*Id.*) Her medical conditions included arthritis lumbar disc degeneration. (*Id.*) Plaintiff also complained of abdominal pain described as aching, acute, and intermittent. (*Id.*) Symptoms started six months before but did not limit her activities. (*Id.*) Plaintiff complained of abdominal pain, gastroesophageal reflux, arthralgias, back pain, and

9

myalgias, but denied diarrhea, nausea, constipation, muscle spasms, stiffness, and swelling. (*Id.*)

Physical examination revealed tenderness throughout the abdomen, paraspinal muscle tenderness,

tenderness in the lumbar spine, and an inability to turn quickly.  (R. at 352-53.) Dr. Salinas

prescribed Cyclobenzaprine and ordered a spinal MRI without contrast. (R. at 354.)

On September 6, 2013, Plaintiff underwent an MRI of the spine. (R. at 364.) The MRI

revealed diffused degenerative changes of the lumbar spine, no significant central canal stenosis,

mild to moderate right and mild left neural forminal stenosis at L4-5, mild left and minimal right

neural forminal stenosis at L3-4 , and a probable right renal cyst. (R. at 364.)

### 3.  Hearing Testimony

On November 4, 2013, Plaintiff and a vocational expert (VE) testified at a hearing before

the ALJ.  (R. at 43-65.)  Plaintiff was represented by counsel.  (R. at 27, 45.)

#### a.  *Plaintiff's Testimony*

Plaintiff testified she lived in an apartment with her husband. (R. at 49.)  She earned a high

school diploma in the Dominican Republic, but she was unable to read, write, and speak in English.

(R. at 59.)

She worked in quality control and inspections from 1998 to 2005. (R. at 47, 52.)  She had

surgery on her arm in 2005, but her movement was restricted after the surgery.  (R. at 48.)  She

could not pick up heavy things, pull down parts, or lift her arm.  (R. at 47-48.)  She was terminated

from her job because the "economy had dropped," and the restrictions from her arm surgery

prevented her from fulfilling her job tasks.  (R. at 47.)  Her job required her to lift more than 50

pounds, which she was unable to do. (R. at 52.)

She attempted to work in 2006 and 2007, but she was unable to hold any job for a long

period. (*Id.*)  In 2007, Plaintiff worked a total of seven weeks.  (R. at 53.)  She last worked in 2007, as an inspector.  (R. at 48.)  She only worked for two weeks at this job because the job was temporary, she was unable to lift heavy boxes, and her arm would lose strength.  (*Id.*)  After this job, she worked checking parts coming off of a machine for a month.  (R. at 53.)  She stopped working after a month because the job was temporary, and she was asked to lift heavy things, which she was unable to do. (*Id.*)  She then worked in packing and inspecting for a week, where she was asked to lift boxes weighing forty-five to fifty pounds.  (*Id.*)  She did not work in inspections any more because of her arm surgery, and she was involved in a car accident in 2008, which resulted in back pain and worsening arm pain.  (R. at 49.)  She received no medical treatment between 2006 and 2008, until she was involved in the car accident, due to her lack of insurance.  (R. at 54-55.) Plaintiff testified that her friend, who helped her complete the Social Security paperwork,  made a mistake on the forms by saying that she did lift heavy things in her past work. (R. at 52-53.)

Plaintiff stated that when she did household chores, such as cleaning dishes or cooking, she had to take breaks after twenty-five minutes.  (R. at 56-57.)  She stated that the breaks lasted between ten and fifteen minutes.  (R. at 57.) She did not drive because of problems moving the steering wheel with her arm. (R. at 59.) She had difficulties sitting longer than thirty minutes, walking longer than twenty minutes, standing longer than thirty minutes, holding objects, opening things, lifting over ten pounds, and getting dressed. (R. at 57-62.)

### b.    *VE's Testimony*

The VE testified that Plaintiff had past relevant work as a parts inspector (light, semi-skilled, SVP: 4) and a hand packager (medium, unskilled, SVP: 2).  (R. at 63.)

The ALJ then asked the VE to opine on whether any of Plaintiff's past relevant work could

be performed by a hypothetical person of her age, education, and work experience, who could perform light work, could lift and/or carry up to 10 pounds frequently, 20 pounds occasionally, and could sit, stand, and/or walk for six hours each in an eight-hour workday, and could stoop, kneel, crouch, and crawl occasionally no climbing ladders, ropes, or scaffolding, and could finger and handle frequently. (R. at 63.) The VE opined that the hypothetical person could perform the general parts inspector as described in the DOT and SCO. (*Id.*)

The ALJ asked the VE to consider a hypothetical person who also "needed to alternate sitting, standing just occasionally throughout the day for a few minutes for a few minutes at a time." (R. at 64.) The VE opined that the hypothetical person could not perform Plaintiff's past work as a general parts inspector. (*Id.*) The ALJ then asked the VE whether any of the Plaintiff's past relevant work skills were transferable to sedentary work. (*Id.*) The VE opined that there were no transferable skills to sedentary work. (*Id.*)

The ALJ asked the VE to consider a hypothetical person who, on a regular basis, had to take frequent rest breaks above the standard one break in the morning, in the afternoon, and at meal time, and whether there would be any jobs this hypothetical person could perform. (R. at 64.) The VE responded that if the breaks were frequent throughout the day, then no. (*Id.*) The VE further testified that if it was a couple of quick bathroom breaks, that would be okay. (*Id.*) In response to a question by the ALJ, the VE also stated that there would be no available positions if a person had unscheduled absences of more than two a month. (*Id.*)

## C.   The ALJ's Findings

The ALJ issued his decision denying benefits on January 21, 2014. (R. at 38.) At step one,[3]

---

[3]The references to steps refer to the five-step analysis used to determine whether a claimant is disabled

he found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of March 1, 2006. (R. at 27-28.) At step two, he found that Plaintiff had the following severe impairments: generalized osteoarthritis, degenerative changes in the lumbar spine, and status post right (dominant) upper extremity surgery. (R. at 28.) Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the following Residual Functional Capacity (RFC): lift a maximum of 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of 6 hours in an 8-hour workday; sit for a total of 6 hours in an 8-hour workday; never climb ladders, ropes, or scaffolds; stoop, kneel, crouch and/or crawl occasionally; and frequently but not constantly finger and handle. (R. at 37.) At step four, based on the VE's testimony, the ALJ found that Plaintiff could perform her past relevant work as a parts inspector. (R. at 38.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any relevant time through her date last insured of June 30, 2012. (*Id.*)

## II.   ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.   **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient

---

under the Social Security Act, which is described more specifically below.

for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).   In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *Id.* at 436 and n.1.

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only

prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012))). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of

the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810

F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back

to the claimant to show that he cannot perform the alternate work.  *Perez v. Barnhart*, 415 F.3d 457,

461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-

step review is conclusive and terminates the analysis."  *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir.

1987).

**B.**     **Issues for Review**

Plaintiff raises two issues for review:

(1) The ALJ failed to to properly weigh the medical opinion evidence and
failed to provide sufficient medical evidence to support the RFC finding for
Plaintiff.

(2) The ALJ failed to properly evaluate Plaintiff's credibility.

(doc. 11 at 2.)

**C.**     **Medical Opinion**

Plaintiff contends that the ALJ erred by according inadequate weight to medical opinion

evidence from her treating physician and providing insufficient medical evidence to support his RFC

determination.  (doc. 11 at 9-14.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  The RFC determination is a combined

"medical assessment of an applicant's impairments with descriptions by physicians, the applicant,

or others of any limitations on the applicant's ability to work."  *Hollis v. Bowen*, 837 F.2d 1378,

1386-87 (5th Cir. 1988) (per curiam).  The relevant policy interpretation regarding the RFC

determination states:

> 1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.
>
> 2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . .

SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(c)(2).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant.  *Id.* § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  *Id.* § 404.1527(c)(2).

If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a

whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)-(6). The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. . . . [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). If the evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

A factor-by-factor analysis is unnecessary when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458. "[A]bsent reliable medical evidence from a treating or examining physician *controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis added).

18

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted) Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, before proceeding to step four, the ALJ determined that Plaintiff had the following RFC to obtain, perform, and maintain light work: lift no more than twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours in an eight-hour workday; and sit for six hours in an eight-hour workday. (R. at 37.) She could not climb ladders, ropes, or scaffolds. (*Id.*) She could occasionally stoop, kneel, crouch, and crawl. (*Id.*) Plaintiff could frequently, but not constantly, finger and handle. (*Id.*)

The ALJ considered all of the medical evidence, including physical examinations and

diagnostic findings, in reaching his RFC determination.  (*See* R. at 36.) He noted that Dr. Santorufo submitted an RFC questionnaire that listed Plaintiff's prognosis as poor and described her symptoms as constant pain in the bilateral hands, lumbar spine, left hip; loss of range of motion in some areas; and numbness and tingling in the left lower extremity with exacerbations due to movement and position.  (R. at 30-31.)  He also considered Plaintiff's testimony.  (*See* R. at 31.)

After considering in detail the medical evidence provided by Plaintiff—including X-rays, CT scan, MRI, and other medical evaluations—the ALJ noted that "[o]rdinarily, a treating physician's opinion regarding a claimant's disability or capability is to be afforded great or controlling weight. . . . [but] Dr. Santorufo, who is not a specialist, saw the claimant only approximately four times in more than one year from February 2011 until June 2012." (R. at 36-37.) The ALJ then found that there was no evidence in the medical record of a spinal cord injury or compression or distortion of the spinal cord; of symptoms such as gait disturbance or numbness; that claimant's hand symptoms were secondary to an abnormality in the spinal cord; that claimant complained of any other significant side effects or that Dr. Santorufo changed medication or dosage due to the claimant's complaint of intolerable side effects, including dizziness; or that claimant had difficulty with attention or concentration.  (R. at 37.)   He then noted that Dr. Santorufo never documented swelling in the DIP and PIP joints of either hand or joint swelling generally, and that the treatment records from Plaintiff's last visit did not show that she had deteriorated further.  (*Id.*)

Additionally, the ALJ emphasized the inconsistency in the treatment notes, medical records, and Dr. Santorufo's medical opinions, including the later records from Dr. Salinas.  (*Id.*)  ("I also note Dr. Salinas did not document many of the objective findings Dr. Santorufo suggested.").  The ALJ then found:

> Dr. Santorufo's opinions are not supported by her own treatment records or by the medical evidence generally. She has not provided any explanation for the discrepancies between her opinions and her treatment records. *I find there is good reason to reject her opinions*, and I have afforded them no weight in reaching my conclusion.

(*Id.*) (emphasis added).  Because he found that Dr. Santorufo's opinions were inconsistent with the objective medical evidence, the ALJ could reject them as not controlling without the need to perform a factor-by-factor analysis. *See Wilson v. Colvin*, No. 3:13–CV–1304–N, 2014 WL 1243684, at 8-9 (N.D. Tex. Mar. 26, 2014).

Plaintiff argues that the ALJ erred in relying on the fact that some limitations were not reported in progress notes.  (doc. 11 at 11-12.)  She relies on cases out of the Third, Eighth, and Ninth Circuits.  (*Id.* at 12) (citing *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d. Cir. 2008); *Leckenby v. Astrue*, 487 F.3d 626, 633 n.7 (8th Cir. 2007); *Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007)).  In *Brownawell*, the Third Circuit advised ALJs that it was improper to discredit a doctor's RFC assessment merely because his or her treatment notes differed from the ultimate opinion regarding a claimant's ability to work.  *Brownawell*, 554 F.3d at 356-57 (stating that "a doctor's notation that a condition is 'stable' during treatment does not necessarily support the conclusion that the patient is able to work").  Similarly, the court in *Leckenby* noted that "[w]hile none of the three physicians made treatment notes specifically reciting the need for rest periods as stated on the MSS forms, [the plaintiff's] medical records are replete with consistent complaints of chronic pain, chronic fatigue and non-restorative sleep at night," *Leckenby*, 487 F.3d at 633, and the court in *Orn* stated, "We therefore do not require that a medical condition be mentioned in every report to conclude that a physician's opinion is supported by the record." *Orn*, 495 F.3d at 634.

Neither party has cited binding authority, however.  (*See* docs. 11, 12.)[1]

Moreover, in finding that Dr. Santorufo's opinions were inconsistent with the objective medical evidence, the ALJ relied on more than the fact that some limitations were not reported in progress notes, or that one report was silent on a medical issue.  (*See* R. at 37.)  As noted, he considered all medical evidence, including objective reports and other medical evaluations, in finding "good reason to reject her opinions."  (R. at 37.)  Because he relied on other evidence *in addition to* the fact that some limitations were not reported in progress notes, this case is also distinguishable from Plaintiff's cases. Accordingly, substantial evidence supports the ALJ's decision and it is unnecessary to consider whether the fact that some limitations were not reported in progress notes would constitute sufficient evidence on its own.

Plaintiff also argues that since the ALJ rejected Dr. Santorufo's medical opinions and failed to incorporate much of her medical opinion in the RFC, the ALJ was required to go through the *Newton* analysis.  (doc. 11 at 10.)  In *Newton*, the ALJ was required to go through the six factors because he rejected the treating physician's opinion as controlling.  *Newton*, 209 F.3d at 456.  A factor-by-factor analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion."  *Id.* at 458.  Here, the ALJ noted that Dr. Santorufo's limitations contradicted her own findings in that she reported that Plaintiff had normal gait, balance, coordination, and reflexes, as well as full range of motion and no indication of muscle atrophy.  (R.

---

[1] The Commissioner does not appear to address this argument in response.  (*See* doc. 12.)

at 36, 278, 293, 306-10.)  The ALJ also considered Dr. Santorufo's diagnosis of myelopathy and noted that there was no evidence of spinal cord injury, compression, or distortion indicated in the 2013 MRI.  (R. at 37, 312, 364.)  Because the ALJ relied on competing first-hand medical evidence in this case, he was not required to perform a full factor-by-factor analysis.  *See id.*

Since the ALJ afforded the appropriate weight to the treating physician's opinions, remand is not required on this issue.

### D.   <u>Credibility</u>

Plaintiff contends that the ALJ's credibility determination was not supported by substantial evidence because he erred in analyzing the required factors.  (doc. 11 at 13-15.)

Social Security Ruling: SSR 96–7p requires the ALJ to follow a two-step process for evaluating a claimant's subjective complaints.  SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).  First, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  (*Id.*)  Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities.  (*Id.*)  If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements.  (*Id.*); *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648–49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record, including medical signs and laboratory findings, and statements by the claimant and her treating or examining sources concerning the alleged symptoms and their effect.  SSR 96–7p, 1996 WL

374186, at *2.   The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements:

1.   the claimant's daily activities;
2.   the location, duration, frequency, and intensity of pain or other symptoms;
3.   factors that precipitate and aggravate symptoms;
4.   the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms;
5.   treatment, other than medication, for relief of pain or other symptoms;
6.   measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back);
7.    and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

(*Id.* at *3.)

Although the ALJ must give specific reasons for his credibility determination, "neither the regulation nor interpretive case law requires that an ALJ name, enumerate, and discuss each factor in outline or other rigid, mechanical form.   It suffices when the administrative decision is sufficiently specific to make clear that the regulatory factors were considered."   *Prince v. Barnhart*, 418 F. Supp. 2d 863, 871 (E.D. Tex. 2005).   Moreover, the Fifth Circuit has explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints.   *Falco*, 27 F.3d at 164.   The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference.   *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).   The ALJ is in the best position to assess a claimant's credibility, since he "enjoys the benefit of perceiving first-hand the claimant at the hearing."   *Falco* 27 F.3d at 164 n.18.

Here, the ALJ acknowledged that Plaintiff's medically determinable impairments could be expected to cause her alleged symptoms as well as pain and functional loss, but he concluded from the entire record that her testimony about the intensity, persistence, and limiting effects of her symptoms was not entirely credible or reasonably supported by the findings of the objective medical

24

evidence. (R. at 32-35.) Although not in a formalistic fashion, the ALJ addressed several of the credibility factors listed in SSR 96-7p, including duration, frequency, and intensity factors. (*Id.*) He first discussed Plaintiff's contentions that her disability started on March 1, 2006, due to her right upper extremity symptoms, but he found there was no medical evidence or other documentation to corroborate her allegations. (R. at 34.) Plaintiff admitted she was precluded from pulling or lifting heavy objects after her surgery, "not that she was precluded from all work." (R. at 35.) Her upper extremities were repeatedly intact with full range of motion; her upper extremity strength was also intact. (*Id.*) Her coordination was also intact and normal. (*Id.*)

The ALJ also noted that many of Plaintiff's purportedly disabling impairments did not arise until years later. (R. at 34.) The ALJ specifically noted that Plaintiff testified that she did not have back pain until the 2008 accident, yet Dr. Salinas noted chronic back pain only since 2011. (*Id.*) Moreover, in 2009 when Plaintiff complained of back pain, she asserted that it had persisted only for three days, not since 2008; she also denied extremity weakness. (R. at 35.) The ALJ also noted her August 2009 examination revealed costovertebral angle tenderness, but her gait, strength, and sensation were all normal. (*Id.*) Furthermore, she had full range of motion in lower her extremities and she remained neurologically intact. (*Id.*) The ALJ stated that he carefully considered the entire record and concluded that Plaintiff's statements concerning the degree of her symptoms and limitations were not credible because they did not support her allegation of disability since 2006. (R. at 36.)

Plaintiff argues the ALJ erred in his credibility determination by failing to support his conclusion with specified objective evidence. (doc. 11 at 15.) In considering her credibility, the ALJ relied on the same evidence as he considered in determining Plaintiff's RFC and evaluating the

opinion evidence of Dr. Santorufo.  (R. at 34) ("As noted above, there is essentially no evidence to support the claimant's allegation of disability . . . . there is no documentation to corroborate her allegation.").  The ALJ also specifically considered that Plaintiff had extensive daily activities, such as walking every day, grocery shopping, preparing meals, cleaning the house, and folding clothes. (R. at 33-34, 49, 56-57, 60, 62, 303.)  Additionally, the ALJ considered Plaintiff's pain complaints, and the record as whole, including her work history and information and observations by third parties and treating or non-treating physicians.  (R. at 32, 36.)

Plaintiff also argues that a lack evidence of medical impairment does not indicate that she was not disabled at any time prior to her date last insured.  (doc. 11 at 15.)  She further argues that "[a]lthough there is no evidence of medical impairments prior to 2008, this does not mean that Plaintiff has not be disabled at any time during that period."  (*Id.*)  Courts have articulated that the lack of objective medical evidence or treatment supports an ALJ's adverse credibility ruling, however.  *See Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988) (recognizing "that an absence of objective factors indicating the existence of severe pain-such as limitations in the range of motion, muscular atrophy, weight loss, or impairment of general nutrition-can itself justify the ALJ's conclusion."); *Villa*, 895 F.2d at 1024 (stating that the ALJ was not precluded from relying on the lack of prescribed treatment as an indication of nondisability).  Furthermore, the Plaintiff bears the burden of proof through the first four steps of the ALJ's analysis.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  Here, Plaintiff is attempting to shift the burden.  Additionally, the ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference.  *Carrier*, 944 F.2d at 247.  Plaintiff has not shown that the ALJ erred by considering the lack of evidence, especially since he considered the record as a whole.  (*See* R. at  28-37.)

The ALJ's discussion shows that he relied primarily on the medical evidence of record to find Plaintiff not credible. Although not in a formalistic fashion, he also considered the factors for determining credibility and adequately explained his reasons for rejecting Plaintiff's subjective complaints, and there is substantial evidence to support his determination. *See Falco*, 27 F.3d at 164. Therefore, remand is not required on this issue.

### III. RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 1st day of September, 2016.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

27